Commonwealth *v.* Williams, Appellant.

530

Argued September 26, 1932.    Before FRAZER, C. J.,
SIMPSON, KEPHART, SCHAFFER, MAXEY, DREW and LINN,
JJ.

*Samuel Moyerman,* for appellant.—The ill advised re-
marks of the assistant district attorney created an im-
proper prejudice in the minds of the jury and resulted
in defendant receiving an unfair trial: Com. v. Mas-
sarelli, 304 Pa. 335; Com. v. Touri, 295 Pa. 50; Mittle-
man v. Bartikowsky, 283 Pa. 485; Com. v. Shoemaker,
240 Pa. 255; Com. v. Bubnis, 197 Pa. 542; Com. v.
Green, 233 Pa. 291.

It is no justification for the assistant district attorney
that he did the things complained of because of some of
the things that he alleges counsel for defendant did:
People v. McCann, 247 Ill. 130.

The charge of the court was inadequate with reference
to the law and facts applicable to the confession of the
defendant: Com. v. Clark, 130 Pa. 641.

*Vincent A. Carroll,* with him *John A. Skelton, Jr.,*
Assistant District Attorneys, and *Charles F. Kelley,* Dis-
trict Attorney.—The statements complained of were in
reply to the address of defendant's counsel: Com. v.
Sloat, 298 Pa. 10; Com. v. Massarelli, 304 Pa. 335.

The matter of the remarks of the prosecutor was in the discretion of the court: Com. v. Ezell, 212 Pa. 293.

The charge was adequate as to the confession: Com. v. Weston, 297 Pa. 382; Com. v. McCloskey, 273 Pa. 456; Com. v. Szachewicz, 303 Pa. 410.

The charge was adequate on the medical phase of the case: Com. v. McCloskey, 273 Pa. 456; Com. v. Payne, 242 Pa. 394; Com. v. Lewis, 222 Pa. 303.

OPINION BY MR. CHIEF JUSTICE FRAZER, November 28, 1932:

Harold E. Williams has been twice convicted of murder in the first degree with the penalty set as death. The facts of the crime and the reasons for granting a new trial are set forth in Com. v. Williams, 307 Pa. 134, and Com. v. Prophet, 307 Pa. 122, and need not be again recited. The case comes before us now on defendant's appeal from the second conviction and sentence, alleging many errors in the trial. We will discuss only a few of the assignments, particularly those relating to improper remarks of the assistant district attorney in the course of the trial and in his closing address to the jury.

The defense consisted principally of testimony tending to show insanity at the time the offense was committed, but was supplemented by a claim of self-defense. The Commonwealth introduced expert testimony indicating defendant's sanity and the jury's verdict sustained this view. On the part of defendant there was testimony of twenty witnesses tending to show his insanity or weak mentality. Among these witnesses were: Doctor Johnson, who for twenty years had been the mental examiner for the Board of City Trusts of Philadelphia and who testified that defendant was "a moron—a high grade imbecile" and that he would remain at the mental age of 12 "as long as he lived"; Dr. Winkelman, Professor of Neurology at Temple University Medical School, Professor of Neuro-Pathology in the Graduate School of the University of Pennsylvania, and associate

of many hospitals including the Philadelphia General Hospital as chief Neuro-Pathologist, who testified that defendant was a "case of constitutional psychopathic inferiority, with mental deterioration and a schizophrenic trend......a splitting of the mind, or a splitting of the personality," and who also gave his opinion that under emotional stress induced by a grievance, real or fancied, he "would not know the difference between right and wrong"; also Dr. Bochroch, Professor of Mental Diseases at Temple University and neurologist for several hospitals, who characterized the defendant as a "constitutional psychopathic inferior," and who gave his opinion that, at the time of the crime, Williams was "in a condition of acute mania" and did not know the difference between right and wrong.

Despite the testimony of these witnesses, the assistant district attorney who represented the Commonwealth at the trial, said at one point in his closing address: "Members of the jury, he [defendant's attorney] has drawn on his experience. He has drawn on it in his characteristically inaccurate way and he has stated in an inaccurate way characteristic of him, certain facts in regard to other cases which are not part of your consideration in this case. He has told you many things, members of the jury, in an effort to sway you. *I say to you now that he does not believe for a moment that his plea of insanity is going to prevail.* Members of the jury, *his effort in this case is to reduce the penalty.* He speaks of murder and he speaks of justice. The effort in this case, members of the jury, is to reduce the penalty. He apparently has abandoned self-defense, because, in an intelligent fashion, such as a lawyer would do, he has not discussed with you the elements of the crime of murder. Oh, no. Not one word relating to manslaughter or its degrees came from his lips, and that is the first duty of defense counsel. Oh, no, not one word." The plain import of these words was to give the jury the impression the defense of insanity and self-defense had been

abandoned, and that defendant's counsel was merely seeking to reduce the penalty from the electric chair to life imprisonment. The prosecuting officer then made further remarks which might have confused the jury, by reciting the facts of a disconnected and irrelevant case concerning a man who was convicted of murder in the first degree with the death penalty and whose sentence was commuted to life imprisonment by the pardon board. The inference was strong, although, of course, the statement was not actually made, that if the jury fixed the penalty at death, there was every likelihood the pardon board would spare defendant's life. It is clear that any misunderstanding on this point was vital, inasmuch as the jury returned to the court room for instructions after having been in deliberation for a considerable time, and requested to be relieved from fixing the penalty. The words of the assistant district attorney took away from the jurors the responsibility resting upon them to exercise their discretion in returning a verdict with a punishment which in their judgment as jurors they deemed proper.

Near the close of the assistant district attorney's argument he pictured the crime as a most atrocious one and referred to the defendant as "A cold, bloodless demon," who killed "not in the ordinary paroxysm of murder," "but sitting there as a fiend would, as a demon would, in the ordinary display of the devilment in his disposition"; defendant's counsel was declared to be seeking to set the defendant "free in jail by a verdict of first degree with life imprisonment, a potential murderer to go out and kill again as they do." These statements, coupled with those already referred to, denied to the defendant any chance for impartial deliberation by the jury, which is an integral part of a fair trial.

After the assistant district attorney had finished his address to the jury, the following colloquy took place, as set forth in the record:

"Mr. Moyerman: I want to enter on the record first of all that I take an exception to the remarks, and I ask for the withdrawal of a juror because of the remarks and comments of the district attorney.

"Motion overruled.

"Exception allowed.

"Mr. Moyerman: I ask that it be noted that whenever he used the word 'he' in his speech, referring to counsel for defendant, he [the Commonwealth's officer] either pointed his finger or his fist at counsel for the defendant.

"Mr. Carroll: That is a lie.

"Mr. Moyerman: I also want it noted on the record that when he used the words 'false defense' he pointed his finger at counsel for the defense. When he used the words 'sex perversion' he pointed his finger at counsel for the defense. Whenever he mentioned 'rotten bones' he pointed his finger at counsel for the defense.

"Mr. Carroll: I did in that instance.

"Mr. Moyerman: Whenever he said, 'He tells you to pour into the ears of innocent children' he pointed at me. When he said, 'He speaks in defense of murder' he pointed his finger at me. Whenever he used the word 'disgraceful' he pointed his finger at me. When he used the word 'rotten' he pointed his finger at me.

"Mr. Carroll: I never used the word 'rotten', I don't go to the gutter for my language.

"Mr. Moyerman: I have asked for the withdrawal of a juror.

"Motion overruled.

"Exception allowed."

As to the use of the word "lie" by counsel in contradicting a witness, see Com. v. Swartz, 37 Pa. Superior Ct. 507, and on improper language, see Com. v. Meyers, 290 Pa. 573, 580; Gibbons v. P. R. R. Co., 291 Pa. 141, 143; Holden v. P. R. R. Co., 169 Pa. 1; People v. Mc-Geoghegan, 325 Ill. 337; People v. Black, 317 Ill. 603.

That portion of the closing argument of the assistant district attorney taken down by the reporter was chiefly

an arraignment of defendant's counsel, and the character of the language used is significant of that found throughout the trial. The record is literally strewn with improper statements and remarks, too numerous to be here set down. For illustration, when defendant's counsel misunderstood his expert, Dr. Winkelman, as to a medical term, the prosecuting officer called attention to the error, and defendant's counsel then suggested "don't make fun of me," to which that officer replied, "I am not making fun of you. Nature performed that act." At another stage he stated that defense counsel had gone through a period of insanity or a paroxysm of insanity.

The court's attention was called to these improper remarks through exceptions, and although proper instructions might have cured the error, the jury was not instructed to disregard them. That portion of the address to the jury noted in italics might be excused under Com. v. Massarelli, 304 Pa. 335, but coupled with what followed, it cannot be pushed aside lightly. Improper remarks and unfair arguments made during the trial of a case involving a serious criminal charge have heretofore been emphatically condemned by this court. We must again forcibly repeat "That the district attorney is a quasi-judicial officer, representing the Commonwealth, which seeks no victims, but only justice; that, since he is invested with these grave responsibilities, he should, at all times, conduct the Commonwealth's case fairly, present it in an impartial manner, and avoid seeking to influence the jury by arousing their prejudices:" Com. v. Cicere, 282 Pa. 492, 495. Moreover, as we said in Mittleman v. Bartikowsky, 283 Pa. 485, 486: "It is to be regretted that all members of the bar do not always keep in mind what was said by this court years ago, that 'A cause is not well tried unless fairly tried and a verdict obtained by incorrect statements or unfair argument or by an appeal to passion or prejudice, stands on but little higher ground than one obtained by false testimony'...... The winning of a

verdict should be a hollow reward to the advocate who has brought it to pass by appeals to a jury's prejudices and not by the strength of the case presented. Such verdicts are, moreover, worthless, for the courts will not let them stand. It is one of the duties of trial judges to keep the argument and remarks of counsel within proper bounds."

We do not wish to be understood as intimating that the assistant district attorney was alone responsible and defendant's counsel free from censure, for the manner of the latter was undoubtedly the cause of much of the unseemly conduct before the court, but all such actions are reprehensible in a court of justice, and particularly so when the Commonwealth asks the death penalty for murder. This case should have been conducted with the dignity that becomes all trials, especially those for murder. Our examination of the record shows the prosecuting officer did most of the interupting, particularly of defendant's witnesses, in many instances taking out of counsel's hands the examination of his witnesses. These improper outbursts and scenes strongly show a wrongful and prejudicial trial of defendant and should have been promptly terminated by the court and counsel reprimanded. The assignments relating to the assistant district attorney's address to the jury must be sustained.

The charge of the court was technically correct in the definition of homicide and all its elements, its various grades and their constituent parts, self-defense, expert testimony, and reasonable doubt, also generally on the defense of insanity, but was not sufficiently definite and instructive as to the application of the testimony adduced. The jurors' minds were left without sufficient guidance with respect to the testimony bearing upon the latter branch of the case. Nowhere in the charge does the court mention defendant's testimony tending to show insanity, except, in speaking of another matter, to say incidentally of the Girard College students: "They tried to tell the truth." The testimony of these boys (with

whom defendant had attended school), defendant's alienists, and that of his immediate family, was not mentioned or considered, nor were the jury instructed as to the legal effect of such testimony. Not a single exculpatory circumstance inuring to defendant's benefit was mentioned. Thus, while the jurors were informed of all relevant legal rules governing the specific ingredients and theories of the case, they were not instructed whether the testimony of defendant was sufficient to sustain his theory as the true one, and the effect of their conclusion when they made such finding. On the other hand, five pages of the charge were devoted to a presentation of the Commonwealth's case as it related to defendant's acts. This was not in itself error, but becomes so because of the oversight of the court in not mentioning the position taken by defendant and the testimony in support of his contention. The charge as a whole did not sufficiently present the case, and unduly stressed the evidence of the Commonwealth, as we said in Com. v. Westley, 300 Pa. 16. See also Com. v. Colandro, 231 Pa. 343, 356. The assignments bearing on these matters are sustained.

The instructions relating to the confession were inadequate, and the assignments relating thereto, particularly 67, 68 and 69, are sustained. The confession was the strong, pivotal fact in the Commonwealth's case, without it no conviction could be had. The confession was denied and it was charged it had been procured by force, intimidation, and hope of reward in some form. The general charge did not distinctly direct the attention of the jury to this denial, nor to any position or situation assumed by defendant; neither did it instruct, as requested, as to the possibility of Williams being easily influenced if they found his mind was in fact of the character described by his alienists and friends. The value of statements testified to by defendant's witnesses should have been pointed out as should those of Commonwealth's witnesses. While, as stated above, there were

general statements of the law applicable to confessions, and abstract definitions, we said in Com. v. Wilson, 186 Pa. 1, it is the duty of the judge under such circumstances to give the jury instructions from the evidence as to how they should view the confession. At page 22 of the opinion, this court said: "This duty of the judge under such circumstances is commented on in The State v. Wentworth, 37 N. H. 218, where the collateral inducement was the desire to obtain a reward that had been offered; in a Virginia case, 14 Gratt. 652, where it was the hope of the prisoner to benefit his mother by his confession; in 94 Cal. 112, when it was to aid his sister; in 22 Maine 171, where it was to save a brother. In all these cases the confessions were admitted, but the collateral inducements [or circumstances] under the influence of which they were made went with them, to enable the jury to determine the degree of reliance to be put upon them."

While the jury may not have believed the testimony of defendant's witnesses as. to the means employed in procuring the confession, still their attention should have been called to it, and they should have been instructed that if they believed what defendant's witnesses said, they should not consider the confession in reaching a verdict. The court gave no such instruction on this matter. See Com. v. Sheets, 197 Pa. 69; also Ziang Sung Wan v. U. S., 266 U. S. 1.

We have discussed this case as fully as necessary, and after full consideration of the voluminous record, we can reach no other conclusion but that a new trial must be granted for the reasons above stated.

Judgment reversed and a new trial granted.