[J-28-2018] [MO: Wecht, J.]
IN THE SUPREME COURT OF PENNSYLVANIA
WESTERN DISTRICT

| COMMONWEALTH OF PENNSYLVANIA, | : | No. 42 WAP 2017 |
|---|---|---|
| | : | |
| Appellee | : | Appeal from the Order of the Superior |
| | : | Court entered on February 22, 2017, |
| | : | at No. 1037 WDA 2016 affirming the |
| v. | : | Order of the Court of Common Pleas |
| | : | of Beaver County entered June 16, |
| | : | 2016 at No. CP-04-CR-0001902-2012 |
| JAVONN ERIC CLANCY, | : | |
| | : | SUBMITTED: March 5, 2018 |
| Appellant | : | |

## CONCURRING OPINION

**JUSTICE DONOHUE**                                  **DECIDED: AUGUST 21, 2018**

In 1936, this Court roundly condemned a prosecutor's reference to a criminal defendant in closing argument as a "cold blooded killer." *Commonwealth v. Capalla*, 185 A. 203, 205 (Pa. 1936). In so doing, we unambiguously ruled that while the prosecutor had every right to argue that the evidence he had presented to the jury proved that the defendant was guilty as charged, he had no right to stigmatize him by engaging in crass name-calling. *Id.* We emphasized that "[t]he application of epithets to a defendant on trial … has no legitimate place in a district attorney's argument," since a "closing argument can be strong and convincing without them." *Id.* at 206. Based upon the principles set forth in *Capalla*, over time this Court repeatedly castigated prosecutors for stigmatizing remarks directed at criminal defendants, including "hoodlums" and "animals," *Commonwealth v. Lipscomb*, 317 A.2d 205, 207 (Pa. 1974), the "leader of this pack of

murderers," *Commonwealth v. Joyner*, 365 A.2d 1233, 1235 (Pa. 1976), and an "executioner," *Commonwealth v. Anderson*, 415 A.2d 887, 889 (Pa. 1980).

Today, in sharp contrast, the learned Majority permits, and perhaps even encourages, a prosecutor's use of precisely the same epithet ("cold blooded killer") that we denounced in *Capalla*. According to the Majority, our law in this area has "evolved,"[1] in two ways. Majority Op. at 28. First, the Majority contends that over time we have come to "express greater recognition of the prosecutor's right to advocate." *Id.* at 24. Derogatory names are now permissible as "offense-centric statements," and must be permitted to allow a prosecutor, as a "zealous advocate," to exercise greater "oratorical flair." *Id.* Second, the Majority insists that we have moved away from *Capalla*'s focus on the content of the prosecutor's remarks to a "two part" test that also requires an evaluation of "the effect of the challenged remarks on the jury." *Id.* This newfound focus on whether the statements at issue were prejudicial, rather than on whether they were improper, further expands a prosecutor's permissible "right to advocate." *Id.* at 21.

I take issue with both of these contentions. With respect to the first, I disagree with the Majority's repeated references to prosecutors as "zealous advocates." This Court has emphasized that because prosecutors, unlike private attorneys, have the added responsibility of a "minister of justice," there are limits to the adversarial nature of their conduct. *See e.g.*, *Commonwealth v. Eskridge*, 604 A.2d 700, 701 (Pa. 1992) (holding that the prosecutor "has the responsibility of a minister of justice and not simply that of an advocate"); *Commonwealth v. Briggs*, 12 A.3d 291, 331 (Pa. 2011) ("[A] criminal prosecutor ... unlike a private attorney, must exercise independent judgment in

---

[1] What the Majority describes is a degeneration of the law, not an evolution.

prosecuting a case and 'has the responsibility of a minister of justice and not simply that of an advocate."). As explained in the comment to Rule 3.8 of the Pennsylvania Rules of Professional Conduct, the responsibility of a minister of justice "carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence." Pa.R.P.C. 3.8 (comment). It does not appear that this Court has ever referred to prosecutors as "zealous advocates."[2] Even to the extent that prosecutors may be characterized as "zealous advocates," the use of epithets is not zealous advocacy. At best, prosecutors resort to name-calling because they are not sufficiently adept at persuasive argument. *Capalla*, 185 A. at 206 ("A closing argument can be strong and convincing without them."). At worst, prosecutors stigmatize defendants to prejudice the jury.

More importantly, I do not perceive any shift over time in a prosecutor's ability to advocate forcefully on behalf of the Commonwealth during closing argument. As early as 1901, this Court observed that upon determining that the accused is guilty of the crime charged, the prosecutor should "lead [the jury] to [its] own judgment by pointing out to them, intelligently and impartially, the evidence which cannot fairly justify any other

---

[2] The Majority represents that in *Commonwealth v. Starks*, 387 A.2d 829 (Pa. 1978), this Court, by way of reference to the ABA's Criminal Justice Standards for the Prosecution Function § 3-01.2(a) ("ABA Standards"), indicated that one of the roles of a prosecutor is that of a "zealous advocate." *Starks*, 387 A.2d at 331. *Starks* and the ABA Standards, however, only refer to prosecutors as "advocates," not as "zealous advocates."

In further support of its contention that prosecutors are "zealous advocates," the Majority also cites to the preamble to the Rules of Professional Conduct, which provides that as an advocate, a lawyer may "zealously assert the client's position under the rules of the adversary system." Pa.R.P.C. Preamble [2]. This provision, however, describes the functions of lawyers generally, not those of prosecutors. The relevant provision of the Rules of Professional Conduct for prosecutors is Rule 3.8 ("Special Responsibilities of a Prosecutor"), which does not contain any reference to "zealous" advocacy.

conclusion." *Commonwealth v. Bubnis*, 47 A. 748, 750 (Pa. 1901). Seventy-four years later, in *Commonwealth v. Cronin*, 346 A.2d 59 (Pa. 1975), we indicated that "a district attorney must have reasonable latitude in fairly presenting a case to the jury[.]" *Id.* at 62. And four years ago, in *Commonwealth v. Burno*, 94 A.3d 956 (Pa. 2014), we explained that prosecutors are "permitted to summarize the evidence, offer reasonable deductions and inferences from the evidence, and utilize "oratorical flair[.]'" *Id.* at 975. Unlike the Majority, I see no significant difference in the descriptions of a prosecutor's latitude during closing argument over time. While more recent cases now typically reference a prosecutor's ability to engage in "oratorical flair," I do not consider this to constitute any significant expansion of a prosecutor's basic function during closing argument or to permit argument that this Court previously ruled was plainly improper. Moreover, "flair" is defined as "a skill or instinctive ability to … make good use of something." https://www.merriam-webster.com/dictionary/flair. There is no skill or instinctive ability involved with name-calling. Indeed, it is the antithesis of oratorical flair.

I likewise disagree with the Majority's insistence that this Court now permits "harsh characterizations of the defendant" because, over time, we have placed an increased emphasis on whether such remarks have the "unavoidable effect" of prejudicing the jury's ability to consider the evidence objectively.[3] Majority Op. at 23. According to the Majority, *Capalla* and its progeny (e.g., *Lipscomb*, *Joyner*, *Anderson*) focused solely on the content

---

[3] While the Majority identifies *Commonwealth v. Stoltzfus*, 337 A.2d 873 (Pa. 1975) as providing the sea change in this regard, the "unavoidable effect" test for prosecutorial misconduct was first announced in our 1927 decision in *Commonwealth v. Meyers*, 139 A. 374 (Pa. 1927); *see also Commonwealth v. Crittenton*, 191 A. 358, 361 (Pa. 1937).

of the prosecutor's remarks and placed little or no emphasis on whether those remarks resulted in "unavoidable prejudice" to the defendant. *Id.* at 17-18.

Contrary to the Majority's assertion, the Court in *Capalla* did in fact place an emphasis on unavoidable prejudice. We cited to *Commonwealth v. Ronello*, 96 A. 828 (Pa. 1916), in which this Court held that a curative instruction by the trial judge after a prosecutor advised the jury of his personal belief of the defendant's guilt "was wholly inadequate to the protections of the defendant rights," and "could give no assurance that the prejudice otherwise certain to result to the defendant had been averted." *Capalla*, 185 A. at 205 (quoting *Ronello*, 96 A. at 829). We then indicated that "[t]here is very slight difference in the character of the statement condemned by this court in [*Ronello*] and the statement complained of in this case[.]" *Id.* Whether by calling the defendant a "cold blooded killer," as in *Capalla*, or by telling the jury that "[m]y own conviction is that [the defendant] did that dastardly deed," as in *Ronello*, the result is, in all but the rarest of cases, the same – specifically, unavoidable prejudice to the defendant.

While I disagree with its reasons, I must concede the result of the Majority's analysis -- that our more recent cases have largely abandoned the sound principles set forth in *Capalla*. As the Majority indicates, the law began its regrettable turn in *Commonwealth v. D'Amato*, 526 A.2d 300 (Pa. 1987), where the prosecutor in closing argument referred to the defendant as a "clever, calculating and cunning executioner." *Id.* at 313. The *D'Amato* Court chose to ignore our 1980 decision in *Anderson*, in which we reversed, based upon careful adherence to *Capalla*, a jury's verdict when the prosecutor likewise referred to the defendant as an "executioner." *Anderson*, 415 A.2d at 889 ("Similarly [to *Capalla*], we here condemn the district attorney's application of the

term "executioner" to Anderson.  This term was equivalent to an expression of belief by the district attorney that Anderson was guilty of murder of the first degree.").  In *D'Amato*, breaking from our long tradition of faithfulness to *Capalla*, we instead ruled that calling the defendant an "executioner" was, while "unfortunate," not prejudicial because the remark was in response to an argument by defense counsel that that the defendant was, inter alia, "an uneducated and ignorant man who was duped" into making a confession. *D'Amato*, 526 A.2d at 313.  We so ruled without discussion of why we were departing from continued obedience to *Capalla*'s foundational principles.

Following *D'Amato*, we completed our abandonment of *Capalla* in *Commonwealth v. Chamberlain*, 30 A.3d 381 (Pa. 2011).[4]  In closing argument in *Chamberlain*, the prosecutor told the jury that during the trial, "we've been in the presence of a murderer." *Id.* at 406.  He later asked the jury to "say to him what I say now, that when you rise you will announce before God and this court and us that you, Terry Chamberlain, are guilty of taking human lives.  You're guilty of murder.  **You are a murderer**." *Id.* (emphasis in original).  Viewing this name-calling "in context," the Court accepted the trial court's argument that referring to the defendant as a "murderer" was entirely appropriate, since it was not merely a "label" but rather an inference drawn from the evidence.  *Id.* at 408. According to the trial court, as adopted by this Court without further comment or

---

[4]  Unlike the Majority, I do not consider our decision in *Commonwealth v. Hall*, 701 A.2d 190 (Pa. 1997), to reflect any movement away from *Capalla*.  In that case, the prosecutor made an indirect reference to the appellant's "cold heart."  *Id.* at 200.  This was not an instance of name-calling, but rather merely a summary of the evidence demonstrating proof of legal malice – as "hardness of heart" has always been one description in the definition of that term.  *See, e.g., Commonwealth v. Packer*, 168 A.3d 161, 168 (Pa. 2017) (citing *Commonwealth v. Drum*, 58 Pa. 9 (1868)).

explanation, because the evidence showed that Chamberlain was guilty, "the prosecutor did not advocate his personal belief of [Chamberlain's] guilt." *Id.*

The precedential basis for our ruling in *Chamberlain* was not clear. We cited to, inter alia, *Capalla* for the proposition that "a prosecutor may argue to the jury that the evidence establishes the defendant's guilt." *Id.* (citing *Capalla*, 185 A. at 206). We then cited to, inter alia, *D'Amato* for the proposition that "arguments from personal opinion as to the guilt of the accused are not proper." *Id.* (citing *D'Amato*, 526 A.2d at 309). These two propositions of law, taken together, however, cannot support the Court's adoption of the trial court's view that calling the defendant a "murderer" is acceptable prosecutorial practice. In *Capalla*, the Court unambiguously explained that stigmatizing the defendant through the use of epithets is, **by definition**, an expression of the prosecutor's personal belief in his or her guilt. *Capalla*, 185 A. at 205-06 (calling the defendant a "cold blooded killer" was "equivalent to an expression of belief on the part of the district attorney that the defendant was guilty of murder in the first degree"). As such, in attempting to understand the Court's rationale in *Chamberlain*, we must either conclude that "murderer" is not a pejorative term, or that the core principles of *Capalla* were no longer worthy of application.

Today the Majority makes clear that the laudatory core principles of *Capalla* are no longer in vogue.[5] This case is a lost opportunity for this Court to right the ship. Our

---

[5] I cannot agree with the Majority's contention that it is merely summarizing and applying the law "as it exists today." Majority Op. at 26-27 n.17. I likewise cannot agree with the Majority's decision to condone (indeed, approve of) the prosecutor's bad behavior here on the highly questionable ground that Clancy's counsel's failure to object is excused because he could not be expected to "predict future developments or changes in the law." *Id.* (citing *Commonwealth v. Spotz*, 896 A.2d 1191, 1246 (Pa. 2006)).

Until today, despite our unfortunate decisions in *D'Amato* and *Chamberlain*, *Capalla* remained good law in this Commonwealth, and it required no predictions of future

cases since *D'Amato* have drawn conclusions without clearly elucidating the reasons for departure from requiring epithet-free closing arguments by prosecutors. Instead of reestablishing the predominance of the prosecutor's position as a minister of justice, the Majority provides an apologia for our jurisprudence's departure from that emphasis.

In my view, this Court's rejection of *Capalla* is most unfortunate for several reasons. The personal opinions of prosecutors, expressed in epithets hurled at criminal defendants, are neither evidence that the jury may consider in reaching its verdict nor reasonable inferences from the evidence of record.[6] The ABA Standards with respect to the closing arguments of prosecutors, adopted by this Court in *Cronin*, 346 A.2d at 62, instruct that prosecutors should summarize the evidence of guilt and may argue all reasonable inferences from this evidence. ABA Standards § 3-6.8(a). At the same time, the ABA Standards expressly forbid prosecutors from making arguments "in terms of counsel's personal opinion" or which are "calculated to appeal to improper prejudices of

---

developments or changes in the law for a prosecutor to know that stigmatizing a defendant by calling him a "cold blooded killer" was not permitted. When the prosecutor in this case called Clancy a "cold blooded killer," *Capalla* expressly and emphatically forbade the use of precisely this epithet. Even in *Chamberlain*, we cited to *Capalla* with approval. It is **today's** decision that, for the first time, overrules *Capalla*, freeing prosecutors to call defendants "cold blooded killers" in their closing arguments in this and future cases.

[6] One federal court has cogently explained that name-calling results in an especially pernicious form of prejudice:

> This type of shorthand characterization of an accused, not based on evidence, is especially likely to stick in the minds of the jury and influence its deliberations. Out of the usual welter of grey facts it starkly rises – succinct, pithy, colorful, and expressed in a sharp break with the decorum which the citizen expects from the representative of his government.

*Hall v. United States*, 419 F.2d 582, 587 (5th Cir. 1969)

the trial of fact." *Id.*, § 3-6.8(b), (c). There is a world of difference between a prosecutor summarizing the evidence presented at trial and arguing that it fairly demonstrates that the defendant killed in cold blood (i.e., with malice), as opposed to calling the defendant a "cold blooded killer." The former constitutes an argument based upon reasonable inferences from the evidence presented; the latter constitutes the prosecutor's personal opinion, which this Court has always considered to be well "beyond the scope of fair play." *See, e.g., Commonwealth v. Lark*, 333 A.2d 786, 789 (Pa. 1975); *Lipscomb*, 317 A.2d at 207; *Cronin*, 346 A.2d at 61.

The use of epithets is, of course, "beyond the scope of fair play" because it is highly prejudicial to the defendant's right to a fair trial. The personal opinions of a prosecutor may well take on overarching significance to the jury, as he or she is a representative of the Commonwealth (and, indeed, of the people of the Commonwealth). When a prosecutor resorts to name-calling, he or she abandons the role of a minister of justice with its concomitant obligation to see that justice is not compromised in an effort to obtain convictions. *See, e.g.*, *Commonwealth v. Collins*, 341 A.2d 492, 493-94 (Pa. 1975); *Commonwealth v. Revty*, 295 A.2d 300, 302 (Pa. 1972). The only reason for a prosecutor to engage in name-calling, as opposed to presenting a reasoned summary of the accumulated evidence of guilt, is to obtain convictions at any cost. *Capalla*'s prohibition against permitting a prosecutor to stigmatize a defendant should apply equally today as it did in 1936. To "stigmatize" a person is to describe them as "worthy of disgrace or great disapproval." https://en.oxforddictionaries.com/definition/stigmatize. It is no part of a prosecutor's function to obtain convictions by belittling the defendants he or she

prosecutes, rather than maintaining a single-minded focus on the evidence proving his or her guilt.

This Court has made clear that "the prosecuting attorney enjoys an office of unusual responsibility, and that his trial conduct should never be vindictive or attempt in any manner to influence the jury by arousing their prejudices.'" *Starks*, 387 A.2d at 381 (quoting *Commonwealth v. Toney*, 266 A.2d 732, 736 (Pa. 1970)). This Court has always emphatically rejected the notion that prosecutors may appeal to the fears or base prejudices of the jury, and in so doing prejudice the jury function by "forming in their minds fixed bias and hostility toward the defendant, so that they could not weigh the evidence and render a true verdict." *See, e.g., Commonwealth v. Simon*, 248 A.2d 289, 292 (Pa. 1968). The prosecutor in this case concluded his closing argument by announcing to the jury, "That's a dangerous man. That is a cold blooded killer." N.T., 4/12/2013, at 48. Without any question, these references to Clancy constituted a naked appeal to the "fears or base prejudices" of the members of the empaneled jury.

In my view, the prosecutor's accusation that Clancy is a "dangerous man" and a "cold blooded killer" was also prejudicial in another way. These terms are not appropriately limited in the scope of their reference, as they suggest not merely that Clancy killed the victim in this case, but rather that he is the type of person who is capable of killing more generally, and without remorse or feeling. An "epithet" is a term that "expresses a quality or attribute regarded as characteristic of the person or thing mentioned." https://en.oxforddictionaries.com/definition/epithet. In other words, name-calling constitutes a statement of personal opinion by the prosecutor on the character of the defendant – in this case, a statement on Clancy's propensity for dangerousness and

violence.  By effectively overruling *Capalla*, the Majority allows prosecutors to surreptitiously introduce propensity evidence in contravention of Pa.R.E. 404, and to do so without the introduction of any character evidence at trial.

Perhaps it is true that when this Court decided *Capalla* in 1936, public discourse was more genteel than the crassness routinely encountered today.  Such does not, however, provide any reason why we should abandon the reasonable and sound principles for the behavior of prosecutors we adopted in *Capalla*.  To the contrary, it constitutes good reason for demanding greater adherence to these principles – to keep today's baseness and crassness out of our courtrooms, allowing juries to decide cases based solely upon the evidence.  We should expect more from prosecutors, not less.  Because the Majority plainly does not, I cannot join its decision.[7]

---

[7]  According, I concur only in the result reached by the Majority, namely its affirmance of the Superior Court's determination that Clancy has not established a claim of ineffective assistance of counsel.  At the evidentiary hearing on Clancy's PCRA petition, PCRA counsel testified that he intentionally did not object to the prosecutor's name-calling because, in his view, it made the prosecutor come across as "combative or dislikable [sic] and almost desperate at times, because … some of the things that you just referenced weren't supported by the facts, and I felt that he was hanging onto calling him names, referencing how he's a killer." N.T., 2/26/2016, at 56-57.  Based upon this unrebutted testimony, Clancy failed to satisfy the second required element for an ineffectiveness claim – that "counsel had no reasonable strategic basis for his action or inaction."  *See, e.g., Commonwealth v. Pierce*, 527 A.2d 973, 975 (Pa. 1987).